We'll hear argument this morning in Case 15-274, Whole Woman's Health v. Hellerstedt. Ms. Tocchi? Mr. Chief Justice, and may it please the Court, the Texas requirements undermine the careful balance struck in Casey between states' legitimate interests in regulating abortion and women's fundamental liberty to make personal decisions about their pregnancies. They are unnecessary health regulations that create substantial obstacles to abortion access. Ms. Tocchi, there is a preliminary question. Would you address that, that this claim is precluded? And let's take first the claim that was in the prior litigation. Let's assume that they're separate claims, or let's take the admitting privileges. That was argued and decided. Why isn't it precluded? Your Honor, it's not precluded because material facts relevant to the claim developed subsequent to entry of judgment in the Abbott case. But you could have amended, you could have asked for supplemental briefing. I mean, the new action is filed six days after the Supreme Court issues its decision in this case. You could have asked for supplemental briefing. In Abbott, the plaintiffs brought the new facts to the attention of the Court of Appeals. The Court of Appeals said that it would only consider evidence in the trial record in rendering its decision, and it held that the evidence in the trial record was speculative, that there wasn't a sufficient basis to conclude that any doctor would be unable to obtain admitting privileges or that any clinic would be forced to close as a result of the admitting privileges requirement. But you made allegations concerning those same claims. I mean, is your argument that when you have allegations on a facial challenge and the facial challenge is resolved against you, that all you have to do is come up with new evidence and then you can start over again? No, Your Honor. The evidence must be material, and it must be newly developed. So newly discovered evidence wouldn't be sufficient. If it was evidence that was available at the time of the first suit, but the plaintiffs merely hadn't discovered the evidence or didn't bring it forward, that wouldn't provide the basis for a subsequent suit. But evidence that develops after judgment in the first suit that is material to the claims does provide sufficient basis for a second suit. And what's this key new evidence? The evidence is the clinic closures that resulted from enforcement, actual enforcement of the admitting privileges requirement. So the first suit was a pre-enforcement challenge. It was before the law took effect, and the court concluded that there is not sufficient evidence that any doctor would actually be unable to obtain admitting privileges or that any clinic would actually close. But there's very little specific evidence in the record in this case with respect to why any particular clinic closed. Basically, your argument is that the law took effect, and after that point there was a decrease in the number of clinics. So suppose you win here, and the state then examines what happened in each of these clinics and comes up with evidence showing that in quite a few instances the closure was due to other factors. And so then could they take the position, well, the decision of this court holding that the law is facially unconstitutional is not binding on us by res judicata, and so you would have to sue them again and they would be able to make the same argument you're making now. Is that correct? No, Your Honor. What's the difference? Well, first of all, the state had an opportunity to bring forward evidence in this case about the reasons why. Was that their burden? No, Your Honor, not in the first instance. But the plaintiffs came forward with evidence, and the state did not offer anything to rebut the evidence, which was more than sufficient to support the district court's finding that HB 2 was the cause of the clinic closures. What evidence is that? There are a couple of things, Your Honor. Prior to HB 2, in the five years prior to HB 2, the number of clinics in the state remained fairly stable. In any given year, there may have been a one to two clinic variance. Following the enactment of HB 2, more than 20 clinics closed within a very short period of time. The timing of the closures alone... I'm sorry. What is the evidence in the record that the closures are related to the legislation? The timing is part of the evidence, Your Honor, and the testimony of the plaintiffs about the reasons why their clinics closed, so that the plaintiffs testified that clinics closed in anticipation of enforcement in some cases, and in some cases because of actual enforcement of the requirements. Can we go on to the second piece, that is the ambulatory surgical centers? That was not part of the last case, and your position on that is that that is a discrete claim, so it's not part of a claim for percusion. Is that your position? Yes, that's correct, and the claims against the ASC requirement weren't ripe at the time that the Abbott case was filed because the final implementing regulations for that statutory requirement hadn't yet been adopted. Well, certainly in the federal system, and I assume in many states as well, regulations sometimes take years to promulgate. I don't know of any rule that says we have to wait for regulations to be promulgated unless it's something unanticipated, and the key objections you're making were clear in the statute anyway. I would disagree that the extent of the burden that the law would impose was clear on the face of the statute. Until those implementing regulations were adopted, and the statute provided a deadline for the adoption of those regulations, until they were adopted, the plaintiffs couldn't have known whether waivers or grandfathering would have been permitted, and if waivers or grandfathering were permitted, as they have been in every other ASC requirement that's been adopted for abortion providers, the burdens would have been much less, and the plaintiffs would have first attempted to get licensed and seek appropriate waivers before filing their suit. So you think you can separately challenge the admitting privilege provision and the ASC provision? Yes, Your Honor, because those- So if you can separately challenge them, if you challenge just the admitting privileges provision, how would you factor in-presumably you would have to assume that the ASC provision was not under challenge, so in assessing the burden you would look at just the admission privilege, and vice versa. If you're challenging just the ASC separately, you'd have to assume-you'd assess the burden solely caused by that provision. It seems to me the separation of the two provisions would make your case much harder. I would disagree with that, Your Honor, because each of these requirements is extremely burdensome on its own. The admitting privileges requirement, which is partially in effect, has been responsible for the closure of nearly half of all the abortion facilities in Texas to date, and the ASC requirement, if it took effect, the respondents have stipulated that it would close any remaining licensed abortion facility that was able to comply with the admitting privileges requirement. So independently, each requirement is extremely burdensome, and collectively the one-two punch of these requirements would be responsible for the closure of nearly 30- I think the Chief Justice asked-I don't want to take words out of his mouth, but I think the question was-one of the two lines that's been asked- is that in the district opinion at page 7, the district court has said that if the ASC regulation goes into effect, there will be one facility left in Austin, two in Dallas, one in Fort Worth, two in Houston, and either one or two in San Antonio. And before that, he said that the enforcement of the appointment privileges, the privileges of admission, would reduce the number from 40 down to about 20. I think the question was, what evidence did those findings rest upon? As you've heard the other side, I think, say, there is no such evidence. Or the Court of Appeals said there is no such evidence. So can you give a brief account or page numbers that will show that those findings, the diminishment of the number from about 40 to about 8, which is what the district court found, rested upon some evidence. What was that evidence? Yes, Your Honor. So initially, 20 clinics closed in the wake of HB2. Eight closed prior to initial enforcement of the admitting privileges requirement, and 11 closed on the day that the admitting privileges requirement first took effect. Respondents quibble with the evidence concerning the first eight. And there is a basis in the record for the district court to infer that those eight closed for the same reasons as all the others. I'm sorry to interrupt you, but where in the record is that evidence? Your Honor, I can provide specific insights during my rebuttal, but the evidence is in the plaintiff's testimony about the reasons why their clinics closed. Each of the plaintiffs testified that their clinics closed either in anticipation of enforcement of these requirements, knowing that the clinic would not be able to continue operating once the requirements took effect, and as a result of that, either they needed to move resources to remaining clinics to ensure that some clinics would continue to operate in the state. What they say, could you give us any record references later or on rebuttal? Yes. As to how many of the total that you claim closed, do you have direct evidence about the reason for the closure? Well, 11 of them, Your Honor, closed on the day that the admitting privileges took effect. And as to how many are you claiming total closed as a result of the law? To date, roughly 20 clinics have closed. And of the 20, as to how many do you have direct evidence? Approximately 12, Your Honor, direct evidence. Because if you go through this, now we're not talking about a huge number of facilities. I really don't understand why you could not have put in evidence about each particular clinic to show why the clinic closed. And as to some of them, there's information that they closed for reasons that had nothing to do with this law. Now maybe when you take out all of those, there still would be a substantial number and enough to make your case, but I don't understand why you didn't put in direct evidence. I mean, I could give you examples. Planned Parenthood Center for Choice, Bryan, Texas. Is that one of the ones you're talking about? Yes, Your Honor. Okay, there's a news report. Planned Parenthood and the Huffington Post reported that this was closed as a result of the 2011 Texas Women's Health Program Bill, which cut funding for family planning services. It's not the law that we're talking about here. Well, Your Honor, that evidence is not in the record. Well, I understand that, and you put quite a bit of evidence that's not in the record in your brief. But my point is, why is there not direct evidence about particular clinics? You said you had direct evidence for 12 clinics, and you were going to supply us with those record citations later. Is that what I understood you to say? Yes, Your Honor, absolutely. But I think what's important to keep in mind here is... Ms. Tovey, could I just make sure I understand it? Because you said 11 were closed on the day that the admitting privileges requirement took effect. Is that correct? That's correct. And is it right that in the two-week period that the ASC requirement was in effect, that over a dozen facilities shut their doors, and then when that was stayed, when that was lifted, they reopened again immediately? Is that right? That is correct, Your Honor. It's almost like a perfect controlled experiment as to the effect of the law, isn't it? It's like you put the law into effect, 12 clinics closed, you take the law out of effect, they reopen. That's absolutely correct. And as the State had stipulated, that's exactly what the State stipulated would happen, and that stipulation is certainly direct evidence of the impact of the ASC requirement. The State, I think, is going to talk about the capacity of the remaining clinics. Would it be, A, proper and, B, helpful for this Court to remand for further findings on clinic capacity? I don't think that's necessary, Your Honor. I think there's sufficient evidence in the record that we have to support the District Court's finding that the remaining clinics, which would number fewer than 10, don't have capacity to meet the statewide demand. There have been some changes, like a major clinic. I don't quite know the adjective they used for it in San Antonio. Suppose there were evidence that there was a capacity and a capability to build these kinds of clinics. Would that be of importance? And then it would show that this law has an effect, and a beneficial effect as far as the legislature is concerned. If the Court had any doubts about the capacity of the remaining clinics, a remand would certainly provide the petitioners with the opportunity to supplement the evidence already in the record. But the evidence in the record shows that it supports the District Court's finding that because the ASC requirements, the costs of it, are so prohibitive, it will deter new clinics from opening to take the place of the ones that closed. The number of ambulatory surgical centers performing abortion has increased by 50% since this law went into effect. Since this law has taken effect, three new ambulatory surgery centers have opened, and there was evidence about that at the trial, and the trial court knew that that was going to happen. The trial court took that into account in making its finding. But nevertheless, there was substantial evidence, including Texas' experience in 2003, following enactment of the ASC law for later abortions, for post-16-week abortions, that shows that the market never adjusted, and the rate at which those procedures occurred in Texas was drastically diminished following enactment of the law. One quick question about capacity. I don't want to take your rebuttal time, but your co-counsel is also litigating a case like this in Louisiana, and in that case, the plaintiffs were able to put in evidence about the exact number of abortions that were performed in all of the facilities. Why could that not have been done here? Why wasn't it done here? Well, so I see that I'm getting into my rebuttal time, Your Honor, but there is evidence in the record about the number of abortions that were performed on an annual basis, the geographic distribution of those abortions. Texas collects those statistics, and those statistics are part of the record in this case. We have absorbed so much of your time with the threshold question. Perhaps you can have some time to address the merits. Why don't you take an extra five minutes, and we'll be sure to afford you rebuttal time after that. Thank you, Mr. Chief Justice. So fundamentally, these laws impose heavy burdens on abortion access that are not medically justified, and for that reason, they impose an undue burden on the right to abortion. Do you think there's a rational basis for the law based on the benefits that the legislature saw? I do not, Your Honor, because— Well, I thought you expressly did not challenge the law as lacking a rational basis. We did not preserve our rational basis claim. The district court denied that claim, and we haven't preserved it here. Here we're focusing on the undue burden. We wouldn't concede that the law has a rational basis because, in fact, it undermines— We have to assume it does since you're not raising that challenge, don't we? Because the law actually undermines the state's interest in health rather than advancing it by causing an increase in later abortions and self-induced abortions, we wouldn't concede that it's rationally related to the state's interest in health, but our— But you said even if. The test is undue burden, not rational basis. That's correct, Your Honor. And in order to determine whether a law imposes an undue burden on the abortion right, we must first consider the magnitude of the burden that it imposes and then compare that burden to what the law is intended to achieve. I don't understand. How is that illogical? I mean, the question is whether there's an undue burden or a substantial obstacle. What difference does it make what the purpose behind the law is in assessing whether the burden is substantial or undue? It seems once you get past the assumption that the law has a rational basis and you haven't challenged that, then you look at the burden or the obstacle. And the purpose that the law is directed to, I would think, doesn't make a difference. It's either a substantial obstacle or an undue burden, or it's not. In order to determine whether a burden is undue, Your Honor, we have to consider what the burden is in relation to. In Casey, for example, in upholding the informed consent requirements, the Court first looked to the state interest that was being served by those requirements. In that case, the state's interest in potential life, and concluded that the requirements were reasonably designed to serve that purpose by making the abortion decision more informed. I thought the undue burden and substantial obstacle went to whether it was undue in light of the woman's right to exercise her right to an abortion, not with respect to the state interest that's asserted. Well, Your Honor, it's both. Casey sought to balance the state's legitimate interest in regulating abortion with the woman's fundamental right, with her liberty to access the procedure, and it concluded that the state couldn't impose unwarranted burdens. So where the state had a good reason to impose a restriction and that restriction didn't impose burdens that were undue, then the restriction could stand. But where a restriction is unreasonable, or in the language of Casey, medically unnecessary, and it's going to impose burdens on access to abortion, then that restriction cannot be sustained under the 14th Amendment. Can I walk through the burden a moment? There's two types of early abortions at play here. The medical abortion that doesn't involve any hospital procedure. A doctor prescribes two pills, and the women take the pills at home, correct? Under Texas law, she must take them at the facility, but that is otherwise correct. I'm sorry, what? She has to come back two separate days to take them? That's correct, yes. So now from when she could take it at home, it's now she has to travel 200 miles or pay for a hotel to get those two days of treatment? That's correct, Your Honor. All right. Let me ask you something about that two-day wait, okay, or that travel time. How many other states and how many other recognized medical people have testified or shown that there is any benefit from taking pills at the facility, as opposed to taking the pills at home, as was the case? There's absolutely no testimony in the record and no evidence in any of the amicus briefs that there's a medical benefit to having a medication abortion at a multimillion-dollar surgical facility. The American Medical Association and every other mainstream leading medical association to consider these requirements has concluded that they are not medically justified for a variety of reasons, including that they impose these onerous burdens on medical abortion, which is the earliest form of abortion, and that these burdens are also imposed on early surgical abortions, procedures prior to 16 weeks, and as a result women are going to be delayed later in pregnancy. There's evidence in the record that following implementation of the admitting privileges requirement in the six-month period following, there was an increase in both the number and the proportion of abortions being performed in the second trimester. So by delaying women's access to abortion, these requirements are actually increasing the risks that women face. If the Chief may permit me to finish my two-part question. Sure. The second is the DNC, dilation and what's it called, dilation and... Kiritajra. Kiritajra. What is the risk factor for a DNC related to abortion and a non-abortion DNC? DNCs are performed in offices for lots of other conditions besides abortion. Is there any evidence in the record that shows that there's any medical difference in the procedures that would necessitate an abortion being in an ACS or not? Are abortions more risky than the regular DNC? No, Your Honor. The evidence in the record shows that the procedures are virtually identical, particularly when DNC is performed to complete a spontaneous miscarriage. So when a woman miscarries and then follows up with her doctor, the doctor will typically perform a DNC, and that's virtually identical to an abortion that is not subject to the requirements of HB2. So your point that I'm taking is that the two main health reasons show that this law was targeted at abortion only. That's absolutely correct. Yes, Your Honor. Thank you, counsel. I'm sorry. Is there any other medical condition, like taking the pills, that are required to be done in hospital, not as a prelude to a procedure in hospital, but an independent, you know, I know there are cancer treatments by pills now. How many of those are required to be done in front of the doctor? None, Your Honor. There are no other medication requirements and no other outpatient procedures that are required by law to be performed in an ASC. Thank you, counsel. General Verrilli? Mr. Chief Justice, and may it please the Court, the effects of the Texas law issue in this case are much more extreme than those of any abortion law that this Court has considered since Casey. This law closes most abortion facilities in the state, puts extreme stress on the few facilities that remain open, and exponentially increases the obstacles confronting women who seek abortions in the state, and it does all of that on the basis of a medical justification that cannot withstand any meaningful scrutiny, that the American Medical Association has told you is groundless, and that the district court found will actually operate in practice to increase health risks to women and not decrease. Is this true of every provision of the ASC law? No. I don't think it is true about every provision in the regulations, Justice Alito. Not the regulations. Yes, in the regulations. Every single provision. Then why was the whole thing held to be unconstitutional? So I agree with the premise of Your Honor's question. There are some parts of the regulation that I think operating alone wouldn't have the substantial obstacle effect. In fact, some parts of the regulation actually restate and reauthorize regulations that were already in the books. And so I suppose one could say that with respect to that set of regulations that the district court could have severed them under the severability clause. One could say that. Of course, they're already in the preexisting regulations. But there are things that go, I haven't checked everything as compared to the prior abortion clinic licensing law against the ASC requirements, but there are some where there's an increase in what's required. It seems pretty reasonable. Under the old law, there had to be a nurse, but not necessarily a registered nurse. Under the new law, there has to be a registered nurse who has a CPR certificate. So you think that's unreasonable to say that there has to be a registered nurse who knows how to do CPR? So I don't want to state an opinion one way or the other about that, but I think getting to the point of Your Honor's question, I think the problem the district court confronted here, and I think the reason the district court acted reasonably, despite the presence of the severability clause, is the severability clause provides an instruction that every provision, every clause, every word, every application to every individual should be severed. And the problem is a problem of the kind that the court noted, I think, in the IOT case where a court trying to apply that, the court's got to go in and decide which collection of the many, many requirements there ought to stand and which shouldn't, and it's going to be invading the state's regulatory power. Well, let's hope it's worked. But maybe the district court should have done that work. I mean, I read through this, and I was surprised. I read through these regulations. I was surprised by how many are completely innocuous, and many of them have nothing to do, they have to do with basic safety. They don't even have anything to do in particular with abortion. So the entrances to the clinic have to be at grade level. You have to have an elevator. The corridors have to be wide enough so that you could bring in a stretcher if somebody has to be taken to the hospital, and things of that nature. I don't know why things couldn't have been severed out if there were some that were. I think some could have, and if the court believes a remand is appropriate for the remedy to be more carefully tailored in the way that the court did in the IOT case, we think that would be appropriate. But we do think that the basic point remains that this is a substantial obstacle, and I would like to address two points that arose during Petitioner's argument, first closures and then capacity. With respect to closures, here's what I think the record will show you. Taking the ASC requirement first, the 13, there's a stipulation, JA 183, that all clinics that weren't already closed as a result of the admitting privilege requirement would not be able to meet the ASC requirements, and therefore could not, would have to cease operations, just as Kagan noted. They did cease operation during the period in which the law was in state. There's evidence in the record with respect to the seven clinics that are operated by Whole Women's Health that it was physically impossible to meet the ASC construction requirements because it couldn't fit on the real estate footprint that they had. It couldn't meet them. There's expert testimony in the record from Dr. Lane Farrar, the economist, that the cost of retrofitting these clinics to meet the requirements would be between $1.6 million and $2.3 million, which would be prohibited, that the cost of building a new facility would be at least $3.5 million, which would be prohibitive, and that the additional operating cost of an ASC would be between $600,000 and $1 million a year more. So I think with respect to those, there's ample evidence. With respect to the admitting privileges requirement, we know that 11 of the 20 clinics that closed between the date when the law was enacted and the effective date of the admitting privileges requirement closed on the date that that requirement became effective. It seems to me the only reasonable inference you can draw with respect to those 11 is that the law caused the closure. With respect to the others, I don't think there's evidence with respect to each one, but with respect to several, there's evidence that they closed in advance of the effective date because they were otherwise going to have to pay a licensing fee to stay open for another year, which they knew they weren't going to be able to stay open, and they didn't want to flush the money away. So I think there's ample evidence in the record with respect to causation. Now, with respect to capacity, I really think this is key because I do think this is the locus of the substantial obstacle problem here. With respect to capacity, before this law took effect, there were approximately 65,000 to 70,000 abortions a year annually. The ASC clinics that will be able to remain open, the ASC facilities that will be able to remain open, performed about 14,000 a year. That's what the record tells you. It's Dr. Grossman's expert testimony. It's in the J.A. from pages 225 to 259. About 20 percent. 20 percent. So they'd have to increase four- or five-fold in a very short period of time against the backdrop of having to meet the problems that the admitting privileges requirement causes. Now, I understand that the Fifth Circuit said that was ipsy-dixit, but with all due respect, that's not binding on you, and it's just wrong. And if you look at the expert testimony at the J.A. pages I identified, you'll see that what Dr. Grossman said first was something that is just common sense, that these facilities aren't going to be able to increase by four or five times. And second, he didn't just rely on common sense. He looked at the period of time between when the admitting privileges requirement resulted in the closure of 20 clinics. He looked at that period of time, and he studied the number of abortions that occurred at the remaining ASC facilities during that period of time, and one would expect, given that half the facilities in the state closed, that there'd be substantial increase. The district court would have had discretion, the district court having substantial equitable powers that appellate courts don't, to say we're going to stay this requirement for two and a half, three years, to see if the capacity problem can be cured. Could a district judge do that? You know, I apologize, Justice Kennedy. I haven't given that question thought, and I'm loathe to opine on that without having given it thought. I mean, district judges often think they can do anything. Right. But I do think, as I said, with respect to the capacity problem, the key thing here is that in addition to these ASC clinics not providing more abortions once half the clinics in the state closed, you had, and this is again in Dr. Grossman's testimony, significant increases in the overall number of abortions, particularly in the parts of the state that were far away from the major cities. There is no evidence of the actual capacity of these clinics. And why was that not put in? Particularly since if we look at the Louisiana case, we can see that it's very possible to put it in. And some of the numbers there are quite amazing. A doctor there performed 3,000 abortions in a year. So we don't really know what the capacity of these ASC clinics are. Well, I think you have expert testimony in that regard. Yeah, but what is it based on? It's not based on any hard statistics. Well, it is. It's common sense. Well, common sense, no. But it's beyond that, as I said, Justice Alito. He studied the period of time in which half the clinics in the state were closed, and you would expect that those clinics, that the additional ASCs can handle the capacity. They would have, and they didn't. He said that the number, the percentage of abortions at the ASCs went down by 4.4 percent, and there was an increased demand for abortion. But there's no statistic showing that there actually was an increased demand for abortion in Texas. I thought that the Grossman affidavit, which I have, I grant you it's going on the breeze, but it said at table, affidavit, page 9, table 2, says that the number of abortions that are on average performed annually at the remaining clinics is 2,000. So let's multiply by 2, and you get 16. Let's multiply by 3, you get 24. There were 70,000, approximately, women who needed these procedures. So I take that. Is that accurate? Yes. Okay. In the short time I have remaining, I'd like to finish with one point, if I could. I think ultimately the question before you is whether the right here is going to retain real substance and with a balance, whether the balance struck in Casey still holds. If that right still does retain real substance, then this law cannot stand. The burdens it imposes, the obstacles, are far beyond anything that this Court has countenanced, and the justification for it is far weaker than anything that this Court has countenanced. It is an undue burden. It is the definition of an undue burden. And, Mr. Chief Justice, in response to your question, undue means excessive or unwarranted. Could be excessive or unwarranted as compared to the obstacle it imposes? Certainly, but also as compared to its need. I would have thought Casey and Gonzales also said substantial obstacle, and I would have thought that's something you could look at in an objective manner. Actually, I don't understand why you're arguing the opposite. I think whether it's an obstacle or a burden would exist without regard to the strength of the State interest. The strength of the State interest, it would seem to me, is evaluated on whatever test there is with respect to that legislation, and then you look at what the impact was. I think it's actually in the interest of government to look at it the way that we're suggesting it ought to be looked at, and I take two minutes to explain why. And I think, Mr. Chief Justice, that is because, you know, it is one thing to say that you're going to impose a requirement that does work as much as to be the kind of obstacle that this requirement, that these requirements do, when you have justification that's frankly flimsy and the American Medical Association has told you is groundless. But if the government were able to come in, if it were us or if it were State, were able to come in and say, well, actually, this requirement is going to make a difference in saving hundreds of lives, that might be a burden that you would think would be acceptable given the medical benefit. That's why we think that the test that makes sense, the best understanding of undue burden, the understanding of undue burden that works best for the government is the one we're suggesting. But I think whichever way you look at that, whether you look at it our way, whether you look at it as two separate inquiries, this law, HB 2, can't pass it for the reasons I said. And I think, therefore, that if you do find that this law is upheld, what you will be saying is that this right really only exists in theory and not, in fact, going forward, and that the commitments that this Court made in Casey will not have been kept. Thank you. Thank you, Counsel. Mr. Keller? Thank you, Mr. Chief Justice. I suppose I should before you say, we'll afford you an additional eight minutes. I think that's roughly. An extra thank you, Mr. Chief Justice, and may it please the Court. Restituted caught on bars, the facial channel is. In any event, Texas acted to improve abortion safety, and Planned Parenthood provides this increased standard of care and has opened new ASCs. Abortion is legal and accessible in Texas. All the Texas metropolitan areas that have abortion clinics today will have open clinics if the Court affirms, and that includes the six most populous areas of Texas. How many women are located over 100 miles from the nearest clinic? Justice Ginsburg, JA 242 provides that 25 percent of Texas women of reproductive age are not within 100 miles of an ASC, but that would not include McAllen, that God has applied a relief, and it would not include El Paso, where the Santa Teresa, New Mexico facility is. That's odd that you point to the New Mexico facility. New Mexico doesn't have any surgical ASC requirement, and it doesn't have any admitting requirement, so if your argument is right, then New Mexico is not an available way out for Texas, because Texas says to protect our women, we need these things. But send them off to Mexico, New Mexico, New Mexico, where they don't get it either. No admitting privileges, no ASC, and that's perfectly all right. Well, if that's all right for the women in the El Paso area, why isn't it right for the rest of the women in Texas? The policy set by Texas is that the standard of care for abortion clinics should rise to the level of ASCs for clinics and admitting privileges for doctors. Texas obviously can't tell New Mexico how to regulate. The substantial obstacle inquiry examines whether there is the ability to make the ultimate decision or elect the procedure. Then why should it challenge those clinics? Well, here, the evidence in the record shows that this particular clinic was one mile across the border that was still in the El Paso metroplex, and women in El Paso often use that facility to obtain abortions. So that would go into the contextual analysis of this particular as-applied challenge. This doesn't go to the facial challenge, but the as-applied challenge on whether women in El Paso do have access to abortion. In any event, over 90 percent of Texas women of reproductive age live within 150 miles of an open clinic as of today. Mr. Keller, the statistics that I gleaned from the record were that 900,000 women live further than 150 miles from a provider, 750,000, three-quarters of a million, further than 200 miles. Now, that's as compared to just in 2012, where fewer than 100,000 lived over 150 miles, and only 10,000 lived more than 200 miles away. So we're going from, like, 10,000 to three-quarters of a million living more than 200 miles away. Well, Justice Kagan, first of all, I believe the statistics at J242, which is their expert testimony, would not account for McAllen or El Paso. But in looking at the fraction of women affected, and that would be the facial challenge standard, that at a minimum, a large fraction of cases, there would have to be invalidity, even if there wasn't a due burden. The travel distance of, even in Casey, the district court found over 40 percent of Pennsylvania women were going to have to travel at least one hour, sometimes over three hours, and there was a 24-hour waiting period. Texas reduces that waiting period to two hours for traveling over 100 miles. And in Casey, that was not a facial substantial obstacle. Here, that relevant fraction is lower. And under Casey, then, the facial challenge would not succeed. And when considerers have a heavy burden and they haven't shown any capacity evidence... When there's a need, meaning, where are you taking into account in the undue burden analysis the value of the need being imposed? Meaning, even if I grant you that in some circumstances, travel time is necessary because you just can't get any kind of abortion clinic to go into a particular area, so you might have to impose a burden that might be undue in other circumstances. Where do we evaluate the benefit of this burden? What's the need? You seem, your brief seemed to be telling us that there's no role for the court to judge whether there's really a health benefit to what you're doing. Well, there would be three elements of the doctrine. There's the rational basis test... I'm not talking about the doctrine. I'm talking about the question I asked, which is, according to you, the slightest health improvement is enough to impose on hundreds of thousands of women, even assuming I accept your argument, which I don't, necessarily, because it's being challenged. But the slightest benefit is enough to burden the lives of a million women. That's your point? And what Casey said is the substantial obstacle test examines access to abortion. Now, if a law had no health benefits, presumably it would be irrational, but even their expert, and this is at JA 256 and 258, acknowledged that some doctors do believe that there are benefits for the ASC and admitting privileges requirement. What is the benefit of the medical, the two pills that you take, what is the benefit of having an ambulatory surgical center to take two pills when there's no surgical procedure at all involved? Two responses, Justice Ginsburg. First, the complication rates are greater. When there's a complication rate from a drug-induced abortion, then a surgical abortion is needed as a follow-up. On the complication, that complication is likely to arise near the woman's home, much more likely to arise near her home, which the 30-mile has nothing to do with. Well, first of all, the two travel distances, that was about the drug protocol. That's a different part of the bill. That was in Petitioner's first lawsuit, and they have not raised any challenge to that in this lawsuit. In any event... I'm not talking about the prior lawsuit. I'm talking about this lawsuit. You need to have access to a hospital within 30 miles. 30 miles of what? 30 miles of the surgical center when the woman lives at a much greater distance, and if she's going to go to any hospital, it will be in her local community, not near the surgical center. Of course, most abortions are surgical abortions in the state. Well, I'm asking you just about the medical. That's right, and also... I can't imagine. What is the benefit of having a woman take those pills in an ambulatory surgical center when there's no surgery involved? Well, there would be surgery in a complication, and all abortion clinics in Texas perform surgical abortions, and that's why Petitioner's probably didn't defend that aspect of the judgment. If there's a complication, it is not going to occur on the spot. I mean, you would have to concede that in the case of the medical abortion, the complication generally arises after the woman is back at home, and in the nearest hospital. It has nothing to do with the surgical center. Although when the significant majority of women are living within 50 miles of the clinic, in most situations, they are going to be in the facility, and it is beneficial to have continuity of care, check for clinical competence to prevent miscommunication and patient abandonment, to have the abetting privileges required. In any event, the facial challenge is certainly barred by res judicata. It was litigated... Is the underlying premise of your argument, Mr. Keller, and of the State's position, that the thrust, the impetus, the effect of this law is to increase surgical abortions as distinct from medical abortions, and that that is within the State's authority to do, because my reading indicated that medical abortions are up nationwide but down significantly in Texas. It would certainly be permissible to regulate both surgical and drug-induced abortions. And in drug-induced abortions, since there are greater complications, in the first lawsuit, the Fifth Circuit noted expert testimony that that was a 6% rate... But I thought an underlying theme, or at least an underlying factual demonstration, is that this law has really increased the number of surgical procedures as opposed to medical procedures, and that this may not be medically wise. Insofar as... You might say that this is within the authority of the State to do, but... Given the higher... And I want to know what your position is on that. And, Justice Kennedy, given the greater complication rates from drug-induced abortion, the legislature would be permitted to act in that way. But, in any event, Petitioners have not challenged that particular part of the district court's holding that gave them as-applied relief on the drug-induced abortion part. In the Fifth Circuit, they haven't raised that. What they're trying to do on the effects prong is say that the remaining clinics will lack capacity. The Fifth Circuit correctly noted that there's no capacity evidence in the record. They didn't even try to take discovery from the non-Petitioner clinics. And, indeed, Grossman's ipsedixit was, in fact, ipsedixit. What he did is he looked at the number of abortions and percentages that were being performed. And a year earlier, ASCs had actually performed more abortions. And so the inference that they were at capacity cannot be drawn. What evidence would you have put in on the capacity issue if you had been afforded that opportunity? Evidence that would rebut the statistically significant showing on the other side about capacity and also the circumstantial evidence about the timing of the closures. Well, this is not in the record, but in Petitioner's first lawsuit, this is Exhibit K, to their application to vacate the state in this court in the first lawsuit, the Abbott litigation. They went clinic by clinic in a chart. Excuse me. And they tried to estimate the number of abortions that could be performed in those facilities. The district court didn't even make a fact-finding there. But the Houston Planned Parenthood ASC, they estimated it could perform 9,000 abortions annually. 9,000. That's 175 a week is what their chart says. Before the act? Well, yes, yes, because the Houston Planned Parenthood... Planned Parenthood operates five of the nine ASCs. Planned Parenthood is not in this lawsuit. They were in the first lawsuit. They have complied with the law, they have doctors with emanating privileges, and they have facilities in each of the five most populous Texas cities. And so if one ASC can perform 9,000 abortions annually, and there are going to be at least eight other ASCs in Texas, plus the tenth facility, the McAllen facility, that obtained as-applied relief, it does not stretch credulity to believe that those remaining facilities would suffice to meet the demand for abortions. And you asked to put in this evidence, and then the court said, no, we will not let you put in the evidence. We didn't put in the evidence because Petitioners bore the burden. Did you ask to put in this evidence? No. No. Thank you very much. Okay. I'd like to go back to the question that Justice Ginsburg was asking, which is about what is the benefit of this procedure. There are two laws. I'm focusing on the first law. The first law says that a doctor at the abortion clinic must have admitting privileges in a hospital 30 miles within that city, nearby. Right? Correct. Okay. Prior to that law, the law was that the clinic had to have a working arrangement to transfer such a patient. Correct? I'm just reading it from this. That's correct. Okay. So I want to know, go back in time, to the period before the new law was passed, where in the record will I find evidence of women who had complications, who could not get to a hospital, even though there was a working arrangement for admission. But now they could get to a hospital because the doctor himself has to have admitting privileges. Which were the women? On what page? Does it tell me their names, what the complications were, and why that happened? Justice Breyer, that is not in the record. So Judge Posner then seems to be correct when he says he could find in the entire nation, in his opinion, only one arguable example of such a thing, and he's not certain that even that one is correct. So what is the benefit to the woman of a procedure that is going to cure a problem of which there is not one single instance in the nation? Though perhaps there is one, but not in Texas. Justice Breyer, the National Abortion Federation previously recommended that women use abortion doctors. I didn't ask that. I'm sure there are people who had all kinds of reasons that would like to have this and so forth, and I'm just asking you where we have a judicial duty to say whether this is an undue burden upon the woman who wants the abortion. There are two parts. Is she burdened? And what is the benefit? And now on the first one, I've asked you to give a single example of an instance where there is a benefit, and you say, I think quite honestly, there is no such burden. So let's turn to the second. The second one, according to the amicus briefs here, which I guess I could validate, that even without the surgical center, leave it out, there are risks quite correct. Those risks are roughly the same as the risk that you have in a dentist's office when you have some surgery where you don't have an ambulatory surgical center. They are 28 times less than a risk of a colonoscopy where you don't have ambulatory surgical center. They are like hundreds of times less that you've seen these briefs. Okay, so I read them and you read them. And so what is the benefit here to giving, I mean the woman, I can't see a zero here, this ambulatory surgical center when the risk is minuscule compared to common procedures that women run every day in other areas without ambulatory surgical centers? That has never been the test under Casey about substantial obstacle. This court in Semopolis, even before Casey, upheld an ASC requirement, and there Virginia did not require that brain surgery be performed in a hospital or an ASC. That's at 5043 of the Semopolis oral argument transcript. That's because in looking at the laws, it's whether the legislature has a legitimate purpose in acting. Legislatures react... Well, can the legislature say anything, General? I mean, if the legislature says we have a health-related abortion regulation here, we've looked around the country and we think that there are 10 great hospitals in the country, Massachusetts General, Brigham and Women's, and we're going to make all our abortion facilities conform to the standards of those hospitals. And that will increase medical care. Now, it's true, we don't make anybody else doing any other kind of procedure conform to those standards, but we think it will increase health benefits if abortion facilities conform to them. Would that be all right? Under this Court's precedent, abortion can be treated differently. That's Semopolis, that's Missouri... So every abortion facility has to hit the standards of MGH. That would be all right? There would have to be medical evidence. It is at a minimum disputed. And here, their experts have conceded that doctors believe this. This is precisely where there's a medical disagreement, even if you don't accept our medical testimony, although it was admitted into the record. I'm sure that there's medical evidence that if every hospital, if every facility was as good as Massachusetts General, they would be better facilities. I'm sure that you could find doctors to say that because MGH, it's a great hospital. But that would be okay, even though it's not applied to any other kind of facility doing any other kind of procedure, even though we know that liposuction is 30 times more dangerous yet doesn't have the same kinds of requirements. That was the holding in Semopolis. And in Missouri, the Court... Would it not be the case that a state could increase the standard of care as high as it wants so long as there's not an undue burden on the women seeking abortion? So, you know, if they could increase the standard of care up to the very highest anywhere in the country and it wouldn't be a burden on the women, well, that would be a benefit to them. Would there be anything unconstitutional about that? No, provided that women do... are able to make the ultimate decision to elect the procedure. But doesn't that show that the undue burden test is weighed against what the state's interest is? Justice Kennedy... Are these two completely discrete analytical categories, undue burden, and we don't look at the state's interest? What Casey noted was that the undue burden test is, is there a purpose or an effect of a substantial obstacle to access? And that's a question about access. As to whether what the state's interest would be, that would be going to a rational basis review or maybe a purpose-based analysis, but you need the clearest proof under the Court's general doctrine about unconstitutional purpose to infer that there's an unconstitutional purpose when there's a legitimate interest in promoting patient health, which is what Texas did here. Even Roe v. Wade said that states can ensure maximum safety for patients. But what is the legitimate interest in protecting their health? What evidence is there that under the prior law, that the prior law was not sufficiently protective of the woman's health? As I understand it, this is one of the lowest-risk procedures. And you give a horrible from Pennsylvania, but absolutely nothing from Texas. As far as we know, this is among the most safe, the least-risk procedures in early-stage abortion. So what was the problem that the legislature was responding to that it needed to improve the facilities for a woman's health? In Petitioner's first lawsuit, Planned Parenthood admitted that over 210 women annually are hospitalized because of abortion complications. As compared to childbirth, many, many, much riskier procedure, is it not? Well, the American Center for Law and Justice and former abortion providers, Amicus Briefs, dispute that. But regardless, there is evidence... Is there really any dispute that childbirth is a much riskier procedure than an early-stage abortion? Justice Ginsburg, those Amicus Briefs point out that when you look at record linkage statistic instead of complication reporting, there may be a difference. And the reason why reporting is important is there's evidence in the record here that abortion complications are underreported. That's at JA 844 and 870-72. In fact, Petitioner of Whole Woman Health... Underreported? Most of the complications you're talking about were reported at hospitals, correct? Yes, there's some evidence of not reporting other things outside the hospital, but you know the number of hospitals are accurately reported. Well, abortion clinics are... have to report complications in Texas. In Petitioner of Whole Woman's Health, and this is at JA 606 and 700... Complications within their clinic. That's right. And at JA 606 and 700, Petitioner of Whole Woman's Health... Let's look at the statistics. 210 from 70,000, my math is pretty horrible. But it's pretty small. And the statistic at JA 266 is that it is lower than 1%. However, when there are two to three women... I don't mean to negate that one should try to avoid injury to anyone. And don't take my question as that. But there are people who die from complications from aspirin. It may be unusual, but there's a certain percentage that do that. Yet we don't require that people take aspirin in ACS centers or in hospitals. But in examining... There has to be some tie between the benefit and the burden. Doesn't there? Well, in examining not a fact but the purpose, the constitutional analysis would be did the Texas legislature have an invalid purpose? Don't you think that you can read that from the fact that there are so many other medical treatments whose complication rates are so disproportionately higher and the legislature is only targeting abortion when there is nothing about the figures before it that show a risk so unusual that it needs greater attention? But that would have been Simopoulos. It would have been Zurich. And this is why petitioners are trying to upset the balance that was struck in cases. Let's see where this fits in. I mean, to the argument, I don't question their purpose. I don't question their purpose. Good. Thank you, Justice Breyer. But what their purpose is is that they're worried about these complications and they want to make life safer for the women. All right, let's take that as the purpose. You said there aren't very many complications. Now, would you say if you reduce the number of clinics, as has been argued, maybe it isn't exactly that, and you suddenly have at least 10,000, maybe a few less, and maybe a few more, women who have to travel 150 miles to get their abortion, maybe more, maybe stay overnight, maybe try to scrape together the money? You understand the argument. Are there going to be more women or fewer women who die of complications due to an effort to create an abortion? I mean, you've read the briefs, and you've read the same articles I have, and of course the argument is if you lead to self-induced abortion, you will find many more women dying. So if the concern is this tiny risk of dying through a complication in a clinic, is this a remedy that will in fact achieve the legislature's health-saving purpose? Justice Breyer, about self-induced abortion, the evidence in the record on that were two points of testimony, both from McAllen where petitioners prevailed, but as-applied challenges can be brought in areas, for instance, if there could be shown a substantial obstacle based on travel distance. The four clinics that closed in West Texas between El Paso and San Antonio, all those closed before the admitting privileges requirement took effect, they were all Planned Parenthood facilities. General, as-applied challenge is a real problem with that, because suppose you bring in that as-applied challenge and you're successful. You can't have a creation of an ambulatory surgical center on the spot. Once these facilities are closed, they're closed and they can't start up tomorrow. So the as-applied challenge, the woman's problem would be long over before this clinic, the kind of clinic they had before, could be restarted. Justice Ginsburg, the McAllen Clinic reopened, and as Justice Kagan mentioned, clinics did reopen. The Lubbock facility, though, which is one of the facilities in West Texas, in petitioners' first lawsuit, they told this Court in their application that that clinic was going to close regardless. And seven of the eight clinics that closed before the admitting privileges requirement took effect, and went from 41 to 33,  Planned Parenthood is complying with the law and providing that increased standard of care. And also the 11 clinics that closed on the day that the admitting privileges requirement took effect, when it went from 33 to 22, I don't believe six of those clinics can be deemed to have ceased performing abortions because of that requirement. The Lubbock facility was going to close anyway. Killeen had admitting privileges. That's J401. There's a stipulation that is no currently licensed abortion facility meets the ASC requirements. Each will be prohibited from performing abortions after the day the law goes into effect. That's a stipulation, not a question of what evidence there was for it. Texas stipulated that no currently licensed facility meets ASC requirements, and each will be prohibited from performing abortions. And that would go to the ASC requirement as opposed to the facial challenges of the admitting privileges requirement. But four of the facilities that reopened, four facilities reopened of those 11 when the admitting privileges requirement went into effect. That was Dallas, two at Fort Worth, one in Austin. That's J131, 715, 1111, and 1436. Two of those were ASCs. Now, when it comes to the count of ASCs, there are nine ASCs performing abortion today in Texas. Three opened up after House Bill 2 was passed. So in examining the facial challenge to that requirement, when ASCs exist... Were they opened as a result of the law, or were they planned to be opened before the law went into effect? Because I think that makes a difference to me. If they were planned to be opened, it takes quite a while to dig up the money, get the investors, buy the land, do the building. It seems to me that they must have been planned for a while, and if they were, it was because there was a need independent of the number of abortions. In other words, it's fortuitous that they've come into existence, but their need was not there, was independent of the reduced number of facilities elsewhere. The legislature provided 13 months to come into compliance. In addition, you could lease space. Texas has over 430... There were 433 general ASCs in Texas at the time. But most of them don't choose to provide abortion. That's correct. Of course, space could be leased in those. So what you don't know is, do you have enough resources to open up an ASC if you're going to do abortions? Are you going to get enough developers to invest in your work? Yeah. The point being that there are going to be at least ten clinics. Can I ask you something, McAllen? There was testimony in the record that at least four doctors from that spot have asked for admitting privileges. The Fifth Circuit's remedy only provided for one doctor, Dr Lin, whose past retirement age, to be the only doctor performing abortions in that clinic. Now, if the clinic had four, I don't know how many it had, but it had at least four people before, it seems rather callous to say, as a remedy, that we're going to make that one doctor do the work of four or maybe more doctors who didn't get admitting privileges. Why is even the Fifth Circuit's remedy reasonable? Because, Justice Sotomayor, that was the only named plaintiff for the as-applied. Yes, as-applied. The AFCS law is affecting this clinic because it can't get its doctors certified. So why does it require a named plaintiff to relieve that clinic of the obligation of going without admitting privileges? Well, that wasn't the only one of the four doctors that joined this lawsuit because most of the doctors and clinics in Texas are not part of this lawsuit. But you just listed the requirements because you know that it's the only clinic in the area. So if any doctor who's licensed appropriately can get admitting privileges, they should be permitted to work in that clinic. Why does Dr. Lynn have to become an indentured slave to ensure that women in her area are provided with their fundamental right to choose? Justice Sotomayor, it would not be an indentured situation. If there were new facts that came into being that that doctor ceased to perform abortion, then another doctor could bring in a future as-applied challenge. But this is not as of... General, could I go back to a question, something that you said earlier? And tell me if I'm misquoting you. You said that as the law is now, under your interpretation of it, Texas is allowed to set much, much higher medical standards, whether it has to do with personnel or procedures or the facilities themselves. Higher medical standards, including much higher medical standards for abortion facilities than for facilities that do any other kind of medical work, even much more risky medical work. You said that that was your understanding of the law. Am I right? Correct, and this Court's encyclical is. I guess I just want to know, why would Texas do that? When there are complications from abortion that's in the record, Texas can enact laws to promote safety. No, I know, but the assumption of the question, and I think you haven't challenged this assumption, is that there are many procedures that are much higher risk. Colonoscopies, liposuctions, we could go on and on. And you're saying, that's okay, we get to set much higher standards for abortion. And I just want to know why that is. Justice Kagan, this bill was passed in the wake of the Kermit Gosnell scandal that prompted Texas and many other states to reexamine their abortion regulations. But of course, Texas' own regulations actually have made abortion facilities such that that can never happen because you have continual inspections. I mean, to your credit. So that was really not a problem in Texas, having a kind of rogue outfit there. Texas has taken actions to prevent that. So again, I'm left wondering, given this baseline of regulation that prevents rogue outfits like that, why it is that Texas would make this choice? And you said you're allowed to make this choice, and we can argue about that. I just want to know why Texas would make it. I think the amicus brief for the 121 Texas legislators that canvases the medical evidence and canvases statements confirms that there were complications, that these laws do have benefits. And even bill opponents said... Are you... You're not really contesting that there are greater complications in abortion facilities than there are with a great deal of medical procedures that are not subject to the same standard of regulation. Brain surgery, for instance, just like Sinopolis, would almost certainly have... It would have higher risk of complications. But the point is, as to rogue facilities, which Justice Kagan just mentioned, one of the amicus briefs cites instance after instance where Whole Woman's facilities have been cited for really appalling violations when they were inspected. Holes in the floor where rats could come in, the lack of any equipment to adequately sterilize instruments. Is that not the case? Stories similar to that are also raised in the 121 Texas legislators' amicus briefs. These are not stories. These are, as I understand it, actual reports of inspections of those facilities. The amicus briefs do discuss that. And the complications from Whole Woman's Health were underreported to the state. It's J-6... Texas, under the fire law, has the right to make random inspections. The problem in Pennsylvania was this filthy clinic hadn't been looked at by anyone from the state in 16 years. But Texas can go into any one of these clinics and immediately spot a violation. It says you can't operate until you come up to the feet. So Texas had, as Justice Kagan pointed out, its own mechanism for preventing that kind of thing from happening. Texas did have existing regulations, but increasing the standard of care is valid, particularly not only in light of... It's valid only if it's taking care of a real problem. And there were abortion complications and underreported... Well, no, no, no, a real problem, meaning Gosell, the governor of Pennsylvania, said it was a regulatory failure, and only in that this clinic had not been inspected for 15 years. The doctor was fabricating his reports. That could happen almost in any city. Anyone who intends to break the law is going to break the law, whatever the regulatory rules are. You're going to have doctors, as happened pre-our laws, who were performing abortions without permission in their offices or without licenses. And I don't want to suggest that we should presume that's going to happen, but it will happen. The constitutional standard for whether a state can make abortions safer can't be that it can only prevent a Gosnell situation and there are complications. But you have to see, as Justice Breyer asked you earlier, why are the problems... Isn't this a self-created problem? What happened in Texas, independent of Gosell, that raised a Gosell-like situation in Texas that made legislature so concerned after so many years about taking care of this greater risk in abortions as opposed to all the other procedures that are performed in non-ACS facilities? Because there are complications in abortion. There is complications in colonoscopies, and colonoscopies are what, 15 times... 28. Justice Breyer, just correct me. 28% higher. Legislatures react to topics that are of public concern. In Gonzalez, the court noted that after Dr. Haskell's procedure for partial birth abortion became more of a nationwide concern, states reacted. When the legislature sees that there's a problem and maybe that there wouldn't rise to the same level of a Gosnell problem, but the legislature can still act to make abortions safer, which is precisely what Texas did here. If I can address my friend's contention of the record as to what clinics closed preemptively, there's evidence in the record that Killeen, McAllen, and El Paso, three clinics, closed preemptively. They brought as-applied challenges in McAllen and prevailed. They brought their as-applied challenge in El Paso and did not prevail. And the Killeen clinic did not seek as-applied relief. Indeed, if there are any future concerns, as-applied challenges can be raised. For instance, the wide swath of area in West Texas does not have an abortion clinic today. There was no as-applied relief sought in this case. And if there were, if it would turn out that there were going to be an issue in that area, a future as-applied challenge could address that concern. That's the problem. Once a clinic closes, you said McAllen reopened, but that was very swift. Once a clinic closes, equipment are gone, the doctors are gone, you can't reinstate it tomorrow. It won't be there. There will be no remedy for that woman who succeeds in the as-applied challenge. Mr. Chief Justice, there are times there's part, if I may address it, except even there, the clinic was not just closed for a single day. It was closed for a longer period of time. There was an El Paso clinic that actually reopened also months later. So an as-applied challenge could allow a clinic, if an undue burden, if a substantial obstacle were shown because of driving distances or capacity in the future in that discrete instance, but when we're in the spatial challenge posture, petitioners bear the heavy burden to show at least a large... Isn't that self-evident in any area? Absolutely. This area of western Texas is as big as California, no? Bigger? Well, I'm not sure about California, but it certainly is a large size. Why isn't it self-evident if you have a law that says you can only be an ACS provider, and who's going to come in and say, I can't be an ACS provider, but it's an undue burden on me, or it's an undue burden that's self-evident on the women in that area? Well, the right is possessed by the women. The clinics and doctors can bring challenges. So why don't we take this lawsuit as those women saying just that? Because there was no... You can't have a law that has marginal, if any, medical benefit be applied to this procedure anywhere where there's an undue burden on women. Planned Parenthood had four clinics in west Texas. They all closed before any part of HB 2 was actually put into effect. They could have brought an as-applied challenge. They didn't. Planned Parenthood did not join this lawsuit. They were part of the first lawsuit. Indeed, the facial challenges here are barred by res judicata, and there are significant record gaps. May I ask you one question? Earlier in your argument, you were quoting how many women are within the reasonable range of the clinic. But don't we know from Casey that the focus must be on the ones who are burdened and not the ones who aren't burdened? There is... And the district court said, you know, this is not a problem for women who have a means to travel, that those women will have access to abortion anyway, in Texas or out of Texas. So Casey was quite precise in this when he's talking about husbands and notifications. You don't look to all the women who are getting abortions. You look only to the women for whom this is a problem. And so the only women we would be looking at is not all the women who live in Austin or Dallas, but the women who have the problem, who don't live near a clinic. Isn't that the clear message of Casey and the husband notification? When a law is regulating women, as it would in the spousal notification provision, that might be different. But when we're talking about doctor and clinic regulations, when the law is going to have a relevant effect, it's going to be for every doctor in every clinic, which is precisely why the Fifth Circuit noted that that was the proper denominator. All women of Texas are reproductive. Asian petitioners have not challenged that denominator holding in their open... But this is about... What it's about is that a woman has a fundamental right to make this choice for herself. That's what we saw as the starting premise. And then this is certainly about... Casey made that plain, that the focus is on the woman and it has to be on the segment of women who are affected. Yes, and the right held by women to make that ultimate decision is not burdened in a minimum large fraction of cases in Texas when each metropolitan area will still have a clinic even after the law goes into effect and future as-applied challenges could address any possible concerns about West Texas or otherwise. Thank you, counsel. Thank you, Mr. Chief Justice. Ms. Todi, you have five minutes remaining. Thank you. A few brief points. First, the record cites from earlier evidence that HB 2 caused clinics to close in Texas. The plaintiffs testified that HB 2 caused clinics in Killeen, Austin, Beaumont, McAllen, and El Paso to close, and that testimony is at JA 339, 715, 722, and 731. Respondents stipulated at JA 183 and 184 that the ASC requirement would cause any licensed abortion facility still operating on the day it took effect to close. Plaintiffs' Exhibit 28 at page 2, which is not in the joint appendix but was admitted in the record at 2808 and 09, demonstrates that for the five years prior to the enactment of HB 2, the number of abortion clinics in Texas remained fairly constant. And finally, at JA 229 and 1430, there is a 229 testimony from Dr. Grossman, and at 439, our response to the Fifth Circuit's directive  that the admitting privileges requirement took effect. The last evidence was from Dr. Grossman? JA 229 is from Dr. Grossman. At page 232, he said, I am not here offering any opinion on the cause of the decline in the number of abortion facilities. That's correct. Dr. Grossman did not offer an opinion on that, but his testimony supplies the fact from which the district court drew the inference that 11 clinics closed on the day that the state first enforced the admitting privileges requirement. The district court referred from that fact that enforcement was the cause of the closure, and respondents offered no alternative explanation for why there would be such a precipitous drop in the number of abortion facilities. Can you tell me why Planned Parenthood, that's the western area? The general says that Planned Parenthood, that ACS and the admitting privileges had nothing to do with the closures in the western area of Texas. Well, the two clinics in El Paso, which is in that western region of Texas, that would be forced to close as a result of these requirements, are not operated by Planned Parenthood. Planned Parenthood doesn't have any clinics in Texas. The plaintiff, in this case, and another independent provider operate those clinics. And as to the clinics where there is direct evidence, does the direct evidence show whether the cause was the admitting privileges requirement or the ACS requirement or both? It does specify, and some specify the admitting privileges requirement, and some specify the ASC requirement, and some specify both. So with respect to whether abortion can be regulated differently than other medical procedures, abortion can certainly be treated differently if there's a reason to treat it differently, but Texas may not impose unnecessary medical regulations that burden women's access to abortion. In Simopolis, the court found that the regulations of second trimester procedures at issue in that case were consistent with prevailing medical standards at the time, and that was critical to the court's decision. That is not the case here. There is extensive testimony in the record that these requirements are not medically justified. They are not consistent with prevailing medical standards, and there are amicus briefs from leading medical associations, including the AMA and ACOG, confirming that. Do you think that federal district judges or this court is well qualified to determine whether there's a different risk with respect to abortion as compared to other procedures that may or may not have to be required, may or may not have to be performed in an ASC? Your Honor, district courts are quite competent to determine the credibility and the reliability of expert testimony. That's something that's within the core competence of a trial court, and the trial court in this case determined that there was no credible or reliable evidence supporting Texas's contentions about the medical justification for these laws. And further, had Texas truly believed that these laws provided some important benefit for outpatient surgery, it would have made them generally applicable. All outpatient surgical providers would have to have admitting privileges or practice in an ASC, but that's not the case. Texas law expressly authorizes other surgical procedures, including those performed under general anesthesia, which early abortion is not, to be performed in a physician's office. And even other physicians that operate at an ASC aren't required to have admitting privileges. The facility is merely required to have a transfer agreement. So these regulations target one of the safest procedures that a patient can have in an outpatient setting through the most onerous regulations. Thank you, counsel. Case is submitted.